Filed 4/8/14  P. v. Sashin CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　v.<br><br>ALEX SASHIN,<br><br>　　　Defendant and Appellant. | B244166<br><br>(Los Angeles County<br>Super. Ct. No. KA087974) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Steven D. Blades, Judge.  Affirmed.

William J. Kopeny for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

After a third jury trial, defendant Alex Sashin was convicted by jury of two counts of committing a lewd act upon a child in violation of Penal Code section 288, subdivision (c)(1) (counts 2 & 5).[1]  The trial court sentenced defendant to three years and eight months in state prison.  The sentence consisted of the upper term of three years in count 2 and eight months (one-third the midterm) in count 5.

Defendant appeals on the grounds that:  (1) the trial court's failure to give a unanimity instruction in count 2 requires reversal of that count because several alleged acts could have constituted a violation of the Penal Code during that time frame; (2) the convictions in counts 2 and 5 must be reversed because the jury instruction omitted an essential element of the crimes charged, i.e., the required mental state; and (3) the judgment must be reversed because the verdicts were not supported by the evidence believed by 12 jurors, resulting in a guilty verdict that was apparently a compromise verdict.

**FACTS**

**Prosecution Evidence**

Anna was born in Russia in March 1991.  Her maternal Aunt E. (Jenny)[2] lived in the United States with her husband, defendant, and their two children.  Anna's parents divorced when Anna was 14, and Anna, her younger sister Jenny, and her mother came to live in defendant and E.'s home in Rowland Heights.  Anna arrived a few months earlier than her mother and sister, in June 2005.  In exchange for housing and food, Anna and her mother were to watch the children and clean the house.  Defendant's children were two and four years old at the time.

---

[1]      A first jury trial resulted in a mistrial due to jury deadlock.  A second jury trial also resulted in a mistrial due to jury deadlock.  In the third trial, the jury deadlocked on counts 4 (copulation with a person under 16), 6 and 7 (unlawful sexual intercourse), and 8 (penetration by foreign object).  The deadlocked counts were eventually dismissed after the prosecution announced its intention not to retry them.  The third jury acquitted defendant of forcible rape (count 1) and sodomy by use of force (count 3).

[2]      We refer to Anna's Aunt Jenny as E. to distinguish her from Anna's sister Jenny.

Anna did not speak English at first, and did not begin learning and having contact with Americans until she went to school approximately three months after her arrival in June 2005. It took her two or three years to speak and understand English fluently.

Anna learned that defendant could have a "wild temper" and be controlling and demanding when defendant asked her to help him clean the pool and she did not immediately respond. Defendant called his wife and told her that Anna was becoming a lazy American teenager and was ungrateful. He made a reference to Anna not being able to live there anymore. Anna thought she would be sent back to Russia and was devastated. Anna knew from that point that if defendant ever asked for anything, she had better listen and do what he said without any hesitation.

Defendant was a computer programmer, and he talked to Anna often about going into programming herself. Anna was definitely interested in programming as a career possibility. Defendant traveled a lot, and one day he suggested it would be good if Anna went with him to Phoenix, Arizona, for a short trip he was taking. Defendant said it would be a great learning experience for her. They left on August 16, 2005. After renting a car in Phoenix, defendant drove to a convenience store, where he bought several items, including lotion. After dinner, they checked into the airport Sheraton Hotel. Defendant told Anna to wait in the car while he checked in. When he returned, they entered the hotel through the side door. When they entered the room, defendant said he was upset because he had asked for two beds and there was only one. He said he would not make a fuss and they would share the bed.

When Anna got into bed, defendant offered her an alcoholic drink, and she refused. On his insistence, she took a few sips. Defendant asked Anna to give him a massage. When she said she did not know how, he offered to give her a massage and show her how it is done. Anna removed her shirt at defendant's request and lay on her stomach.

Defendant rubbed lotion on Anna and gave her a massage. At one point, defendant touched Anna's vaginal area inside her underwear. After a few minutes, defendant removed Anna's underwear.

Defendant asked Anna if she was a virgin and she said she was. He asked her if she wanted to have sex with him, and Anna said "no." Defendant said it was normal for a 14-year-old to have sex, that everybody in Russia was doing it, and she would really like it. Defendant told her that he really wanted her and they could have sex in a way that she would still be a virgin. He asked her to kiss his penis and she did so. Defendant took out a condom from his bag and put it on. He inserted his penis in her vagina, and she told him that it was very painful. Eventually he ejaculated. Defendant went to the bathroom and Anna went to sleep.

At breakfast the next morning, defendant said that what had happened was a big mistake, and it would never happen again. He told her not to tell anyone because it would destroy his family and his life. Anna hoped it would never happen again and decided to keep the secret for the sake of saving her family. When they returned home, Anna pretended nothing had happened.

Approximately a few weeks later, Anna told Jenny that something happened between defendant and her in Phoenix but that it was a secret. Jenny was shocked but she said "Okay."

During that same month of August or the beginning of September, another incident occurred. Defendant asked Anna to stay home to help him install a television in the living room while everyone else went to shop at Costco. At one point, Anna sat down on the couch. Defendant sat down next to her and put his hand on her thigh. He began moving his hand up and Anna realized he was asking for "a second time." He asked her to go upstairs and they went and had sex on his bed. Anna was "scared to say no." Defendant said he "can't help himself." When the rest of the family returned home, Anna pretended nothing happened.

After this second time, having sex with defendant "was just a routine." If no one was at home, they would have sex several times a day—whenever defendant got a chance. This would occur twice or three times a week when defendant was home.

Defendant took Anna to register for high school. On the way home, they saw some students. Defendant told Anna that he did not want her to date anybody, and if she

4

got a boyfriend he would kill him. Defendant told her that sex between them was a mistake and would not happen again.

During September 2005, while Anna was ironing defendant's shirts in the master bedroom, defendant asked to have sex with her. Anna said she did not want to because she was on her period. Defendant said he still wanted her and told her to lie down on the floor. She did so but said she did not "want it right now." As she lay on her back he took her hands and held them down to the floor. Defendant took out a condom and had intercourse with Anna. Anna cleaned up the blood on the floor when it was over. Anna sat on the stairs and cried, and defendant sat next to her and said he felt like a monster.

In September or October 2005, defendant told everyone in the family that he was going to take Anna to the movies because she had never been to an American movie theater. On the way home, defendant pulled to the side of the road, and he had sex with Anna in the car. He did not ask her if she wanted to have sex. That same night, Anna told her sister Jenny that she and defendant had sex in the car. She said not to tell anyone.

Defendant and Anna had vaginal sex in the car from three to five times and oral sex three or four times. The incidents inside the car became more frequent.

Defendant had a large cabin in Lake Arrowhead, and Anna went there many times. During her visits, defendant instructed her to put his kids to bed, take a shower, change into sexy clothes, and meet him in the bedroom. He had given her money to buy black underwear and stockings. Anna said that "a lot of things took place there, including oral sex and vaginal sex and anal sex." Once, Anna entered defendant's bedroom and found him watching lesbian pornography. He wanted her to watch it, but she refused. On that occasion, defendant turned off the television and then had sex with Anna.

Defendant put his fingers in her vagina many times. He put his fingers in her anus after asking her to have anal sex with him. Anna complained that it hurt and told him to stop. He then tried to insert his penis in her anus, but it did not go all the way in. After that occasion, defendant had anal sex with Anna two or three times, probably when she was 15 or 16. They also engaged in oral copulation in Arrowhead during the three years

and 60 to 80 occasions when they went there. She continued to go to Arrowhead until she moved out of defendant's home in May or June of 2008.

Anna noted that defendant had a deep scar on his "left butt cheek." When swimming, defendant always wore swim trunks that covered that scar. She also noticed that defendant's buttocks were "really hairy." Defendant once showed Anna his penis and explained that it was not circumcised. It was stipulated at trial that defendant was not circumcised.

Jenny was 12 years old when she found a used condom in the guest toilet at the Arrowhead house. It had not been there the night before. Only she, Anna, and defendant were staying there at the time. Jenny was shocked to know that "it was still going on." She was scared for her sister. On one occasion in Arrowhead, Jenny walked in a room where the back of the couch faced the doorway. She saw defendant sit up quickly on the couch, and then Anna sat up. When Jenny sat down on the couch, defendant began adjusting his sweatpants. Anna looked ashamed. Jenny remembered that while they were living in defendant's home, defendant would take Anna everywhere. They were always together.

On several occasions, defendant told Anna he loved her, and Anna believed him. At some point she felt that she was in love with him. During her junior year, there were times when Anna would go to defendant for sex. She did not know why, except that she might have felt she had power over him or that she was very wrapped up in the whole affair. Anna estimated that she had sexual intercourse with defendant 300 to 500 times during the three years she lived in defendant's house.

Toward the end of Anna's freshman year, she confided in a classmate and friend, Dina. She told her that she was not a virgin and that she was having sex with her uncle. Dina testified about the details of Anna and defendant's trip to Phoenix as related to her by Anna in their freshman year of high school. Anna told Dina about other incidents that were "going on through the years." Anna told her about the black underwear and said that Victoria's Secret was defendant's favorite shop. Anna said she wanted to end it but she was afraid of defendant's reactions and of his sending her back to Russia.

6

In 2006, Anna's mother, L (Mila), met James G. and married him in 2007 when Anna was in 10th grade.[3] Mila's two daughters did not initially move to James's home so as not to change schools. Mila told James that defendant wanted the girls to stay with him even on weekends, and she had negotiated to have them every other weekend. Anna almost never came to the G. house, however, because she was needed at defendant's house. Jenny moved into the G. household in November 2007.

One time, during late August 2007, James had scheduled a Saturday dental appointment for Anna and Jenny. He told defendant he would pick them up on Friday and take them to their appointment on Saturday. Defendant told him, "No. . . . You can't do that." On Saturday, defendant called and angrily said he had no time to take the two girls to the dentist. James then picked up the two children for the appointment, and after the appointment, brought them back to James's home. On Saturday morning, defendant called and spoke to Anna on the telephone. Anna began shaking and crying and James could hear defendant screaming, "You come home! You come home now!" On another occasion when Anna stayed at the G. house, defendant called and screamed at Anna over the telephone.

In October 2007, James went to pick up Jenny and was let into the house. James walked inside as far as the back door and saw defendant pressing his body against Anna's and putting his hand on her body. Anna and defendant were in their swim wear. Anna, who had her head down, did not react. When defendant walked away, James went outside and asked Anna if everything was okay. Anna said, "Yes." Anna was 16 at the time. James was suspicious about the incident but did not mention it to his wife because he did not know what it meant.

Eventually, the living arrangement with the girls resulted in tension and arguments between the two households. At Christmastime, James insisted that Anna stay with him and Mila for the Christmas holidays, and he went to pick up Anna. Only defendant's

---

[3]    We refer to Mila G. and James G. by their first names.

7

wife was home. Anna stayed at the G.'s home for approximately 12 days and then returned to defendant's. After that, Anna was never "available" to go to the G. household. James did pick Anna up once and did not see defendant. Mila then telephoned James and told him that he was not allowed to pick up Anna and if he did, she could not return to defendant's home.

Anna moved out of defendant's house in June of 2008 and moved in with her mother and stepfather James. She communicated with defendant for the first week, and they sent some e-mails, but they eventually stopped talking. Anna realized once she was out of defendant's house and free from his control that he was a liar, did not love her, and that it "was a very, very messed up situation." Anna did not want to tell anyone about her relationship with defendant. She thought it would be easier to forget and move on with her life. James believed that after a month or two, Anna started to open up. She seemed happy in her new environment.

On August 31, 2008, defendant sent Anna an e-mail. It read as follows: "It's hard to follow you. Just a week ago you wrote me in Russian that it is up to me our future relationship. I made up my mind, but you changed everything. You do not want even see me. You told me before that you had just the great time, and now you're saying that it is worst time of your life. I had the best time of my life to spend the most wonderful time with you and Jenny at AH [Arrowhead]." The e-mail ended with, "I do not understand why you think so bad about me. I never planned anything." In an August 30, 2008 e-mail, defendant wrote, "It is my fault that you're not in college right now. If you stayed with us you would be in the college. I should never let you go. I can't afford to lose you." He ended with, "You [hurt] me so much by betraying me, but I can live with that." Anna began having nightmares about defendant coming to her mother's house and chasing her or defendant being on top of her and her trying to escape.

Anna began attending Fullerton College in the spring of 2009. She met her boyfriend, Bryce, on the first day of classes. During an online chat in February or March 2009, Bryce asked Anna if she was a virgin. Anna told him she was not and that she had been raped.

8

Also in February of 2009, the G. household and defendant's household began to communicate again. The G.'s were invited to Rowland Heights for a birthday party for defendant's son. Then in April 2009, the G.'s went to a birthday party for defendant at the Arrowhead home. Jenny noticed that Anna avoided defendant and tried to stay next to Jenny.

Anna was worried when the families began talking again because she did not want to see defendant or go to his home. During a conversation with James, in which he tried to counsel her about her relationship with her boyfriend, Anna blurted out that "you don't know how much I've been hurt already." Later he asked her where she had been hurt, and she told him, "Alex." He began to ask questions and Anna "pretty much told him everything."

James recalled Anna explaining that the incidents started when defendant took her to Phoenix in 2005. She said it had been going on until she moved into the G. home in June 2008. Anna described oral copulation, vaginal sex, and sodomy. Anna was ashamed but James wanted everyone to know. Anna eventually agreed to tell her mother. Anna's mother was angry and upset and began crying. The family decided to tell E. Anna was against the idea of going to the police because it would destroy defendant's family.

Anna did not know anything about E. and defendant's finances, and her aunt never discussed any financial issues with Anna. Anna had heard there was a lawsuit between defendant and his business partner, but her aunt never discussed it with Anna.

On May 18, 2009, James made a phone call to E. He told her what had happened. E. was in shock and said something to the effect that she did not want to believe it. James and Anna went to see her weeks later when defendant was not at home. Anna had to tell E. a lot of details before she began to believe Anna. When James said he was thinking of going to the police, E. pleaded for them not to and said, "We'll fix him, he'll go to church, we'll find a way out of this."

Anna eventually told Bryce that defendant was the one who raped her. Bryce said she needed to report the incidents to the police. The family reported the incidents to the

9

police on July 18, 2009. They reached the conclusion that Anna had to confront defendant through the police in order to heal. Los Angeles County Sheriff's Detective Terrence Smith was assigned to the case on July 19, 2009. No one in the case ordered the victim to submit to a sexual examination. This was standard practice when more than 96 hours had elapsed after a sexual assault.

Detective Smith asked Anna to place a pretext telephone call to defendant on or about August 12, 2009. The conversation was in Russian. In the call, Anna said she could not live with her parents anymore and was tired of it. She suggested they get together. Defendant said he could pick her up and they could go to Lake Arrowhead. Anna asked if she should bring her stockings with her. Defendant pretended that he did not hear exactly what she said and said a different word. Then he ended the conversation. Defendant was arrested on August 25, 2009.

Psychiatrist Steven Grob testified that child abuse accommodation syndrome addresses the issue of why a child does not come forward about ongoing molestation. The child adapts as a means to survive. Being molested at 14 and then continually over almost three years without reporting it is consistent with the syndrome. The child often feels ashamed, humiliated, embarrassed, and fearful of not being believed. The child often feels guilt. The child would also be concerned about consequences to other family members and even to the perpetrator. It is not uncommon for the child to say that she felt like she was in love with the molester. These children often confide in a friend of their own age. They may focus on school work as a way to disassociate from their own life. It is not uncommon for a young lady to reveal what her prior experiences had been if she began to develop an intimate relationship with a boyfriend.

10

**Defense Evidence**

Anna's mother, Mila, testified that neither Jenny nor Anna told her about the molestations, and Mila never suspected anything. Mila "would never even go to think that way." She believed in defendant's good intentions and was grateful he spent so much time with Anna. Anna never told Mila, after Mila's marriage, that she did not want to stay in defendant's home.

Mila recalled one time in 2005, when she was cleaning the floor in defendant's home, and she opened the bathroom door. Anna was standing there with a frightened face and wearing a swim suit. She told her mother she was changing. Suddenly defendant came out of the bathroom without any expression. Mila so trusted him that she did not question why he was in the bathroom alone with Anna.

Mila did notice that Anna's behavior was different when Anna moved to the G. house in that she did not talk with Mila anymore. Anna often appeared sad. When Anna finally told Mila about the molestations, she said she could not tell her earlier because it would destroy the whole family. Mila remembered defendant screaming at Anna on the telephone after the dental appointment. Anna cried and said she had to go home. When Mila told defendant she needed to see her kids, he told her she was ungrateful and she should help her family. He said that he also needed them.

Mila remembered the Phoenix trip. Defendant told Mila he was going to get two rooms. Mila remembered feeling guilty that defendant had to pay for an extra room.

Defendant's wife, E., worked in the fashion industry. She needed help with her two children, the youngest of whom had Asperger's disorder. Mila came to the United States to help her. Defendant was very interested in the idea, and financially supporting Mila and her children was not an issue.

E. testified that the house in Rowland Heights had been completely paid for. Both she and defendant worked, but defendant made more money. She estimated that the house was worth $730,000 at the time of trial. The Arrowhead house also had no mortgage.

E. would never have assumed defendant was having sex with Anna, but she had many conversations with him about spending a lot of time with Anna rather than with E. and his children. Defendant often insisted that Anna swim with him, and Anna would make an excuse. Defendant called this "niece time" and turned it into an order. Defendant once called E. at work and told her he and Anna were going to the Lake Arrowhead house by themselves. E. was upset and said, "No, I don't like it." Defendant returned home. E. was jealous of defendant's time with Anna but not of Anna, although she knew in her heart "that it does have to do with Anna being so young and pretty."

When defendant arranged the Phoenix trip, he told E. he would book two rooms. He said he had enough points, and it would not cost a penny.

E. and defendant never used condoms, but she found a lot of fruit-flavored condoms in his drawer after he was arrested. They "barely ever had sex." E. began sleeping with her children because defendant did not want her to sleep in the master bedroom. Defendant said he needed a good rest, and E. would check on her children during the night. After Mila was married to James, defendant wanted Anna to stay with them. He had many reasons. E. did not need Anna because Anna did not spend time with the children on weekends anyway, since she was always with defendant. When James insisted on picking up Anna on a Friday, defendant became angry and said if she went she was not coming back. Later defendant said James could not come back in the house.

When James called E. to tell her about the molestations, she could not believe it. She kept saying, "My husband cannot do it." She cried a lot but did not ask defendant about it. James told her not to say a word. E. did not know defendant was going to be arrested. She did not want her family to call the police because she thought there might be a way to save the family and to help defendant.

After she learned about defendant's conduct with Anna, E. once blurted out to defendant, "You can't be around kids." Defendant said, "You're a different person, something is going on." He grabbed a plate and smashed it over the table. He then said, "If it comes from your family, I'm going to kill them. If it comes from your sister, I'm

12

going to—whatever who is destroying my family, I'm going to find out and I'm going to kill them." Defendant grabbed a chair and smashed it into pieces in front of his son Max.

After defendant's arrest, defendant threatened E. that if she ever filed for divorce, he would take the children to Brazil. E. filed for a divorce four days after defendant was arrested because she decided she could never trust him again. A few days after he was arrested, she closed two bank accounts in her name to which defendant had full access. She opened new accounts with the money, a total of $64,500. A bail bondsman called and said they needed defendant's cell phone and passport but she did not turn over the passport for fear that defendant would leave the country with the children. E. refused to bail out defendant on her family's advice. They said they would not speak to her again if she bailed him out.

Defendant called her from jail and told her to offer $50,000 to the G. family to drop the charges. E. went to their home and began talking about dropping the charges. James and Mila became angry, and E. did not even go so far as to mention the $50,000.

E. testified that a month and a half before James called her about Anna, she went with defendant to Phoenix in regard to a lawsuit. E. was also a named defendant. She denied that two days later she threatened defendant with divorcing him, taking the Rowland Heights home, and getting custody of both children. E. testified that her standard of living has gone down since she divorced defendant. She has many expenses, including her son's special education needs. She had to take out a home equity loan because defendant has not paid anything for three years.

Defendant presented a character witness, Anatoly Valushkin. Valushkin stated that his family, including a 12-year-old daughter and a 24-year-old daughter, frequently stayed at defendant's house, and he had never witnessed defendant acting inappropriately toward his daughters.

Defendant testified that he was born in Russia and studied to become a navigation officer. He attained a prestigious assignment as the navigation officer of a submarine. He was honorably discharged and, at the age of 26, he moved to Sweden. After 12 years in Sweden, he was offered a job by a company in San Diego as a software programmer

developer. He met E. after a year and they married 10 months later, in 1999. They moved to Rowland Heights in 2004. In November 2005, he purchased the Lake Arrowhead house, which belongs to a family trust that he formed in 2002. He started his own company in which his wife had a 49 percent shareholder interest.

Defendant said that the mortgages were paid off with his money. The money in the accounts that E. closed was deposited by him, and it was his money.

When E. became a citizen, she told defendant it was her dream to bring her sister and her entire family to the United States. Defendant did not like the idea at first, but agreed because Mila was a teacher of Russian language and literature, and she would teach his children the Russian language. After they came over, Anna offered to clean the house once a week for $45 dollars and defendant agreed.

Defendant said he never asked Anna to clean the pool. Once she was rather rude to him and he told her that she had to behave if she wanted to live "in this house." Defendant never yelled at Anna, and their relationship was great after that.

Defendant had originally booked his August 16, 2005 trip just for himself. Anna had asked him several times to take her with him. Anna's flight was booked the day after defendant booked his own flight. Nothing sexual happened between Anna and him while in Phoenix. Defendant had called the hotel and asked to change the reservation to a room with two beds instead of one queen bed. Defendant said it was a hotel regulation that teenagers cannot stay in a room by themselves. E. did not ask about the sleeping arrangements, but everyone knew, including Mila, that Anna was going to stay in his room, and it was common sense. The hotel informed defendant upon arrival that they could not find a room with two beds on the fourth floor where he always stayed. He remembered that he asked for another room for Anna and the hotel said they did not have one. He did not sleep in the bed with Anna. He slept on cushions on the floor. Anna was very happy about the trip.

Defendant stated that he never had sex or any inappropriate sexual contacts with Anna while she lived with him. They had a big happy family. Anna and Jenny called him the best uncle in the world in a birthday card.

Defendant testified, based on a receipt, that he bought the big screen television on September 10, 2005, and installed it the same day in 15 minutes. On September 11, the day his wife went to Costco, defendant had a flight to Sacramento at 5:00 p.m. He did not ask Anna to stay behind to install the television.

Defendant also had receipts showing that his cable package at the Lake Arrowhead home did not include pornography channels. The Rowland Heights cable subscription was for a full package, which "more likely it could be adult channels as well." However, defendant only watched the Discovery channel and history channels—he never watched pornography.

Defendant did not believe he had condoms with him on the Phoenix trip with Anna. He did buy some fruit condoms once as souvenirs and put them in a drawer. Defendant used condoms with his wife. Defendant had no idea why Jenny would say she saw a condom in the toilet in Lake Arrowhead when only he, Jenny, and Anna were staying there. He had no idea how Anna would know that he had hair on his buttocks. Defendant testified that he was not circumcised because nobody in Russia is circumcised unless one is a Jew or a Muslim. His scar was visible to others and he explained to Anna and many others the history of the scar.

Defendant testified that he did not like James from the beginning for many reasons. He was concerned that James might break a leg on their property and sue him. When Mila married James, defendant wanted Anna to move out, but Anna expressed that she wanted to stay behind.

After the trip to Phoenix with E. for the lawsuit on April 5, 2009, E. exploded and blamed defendant for everything. E. demanded that defendant settle the case. From then on, they fought every day. E. threatened defendant with a divorce by the end of April 2009 if he did not settle the case. She said she would take the Rowland Heights home and obtain custody of the children, and defendant could live alone in the mountains. A few days later, from out of the blue, she told him he was going to go to jail for "minor seductions." She said "some diaries were found."

15

Defendant was arrested on August 25, 2009. He testified that, during the three months leading to that date, E. acted normally, and they hosted parties in their home. The angry argument in which he broke a chair occurred because E. told him that she had an abortion. She said she was glad to kill his baby.

Defendant asked his wife to bail him out many times. E. told him he had to confess before she helped him. Defendant tried accessing money from jail only to find out E. had changed the password to their bank account.

It was E. who suggested to defendant that he should pay off the G.'s. Then defendant said, "Why don't you offer $50,000?" E. told him that her family was expecting a huge reward. When defendant was bailed out on September 2, 2009, he went to his Rowland Heights home and found only $15,000 in cash in his safe. About $30,000 was missing. He began living at the Lake Arrowhead house. He was subpoenaed for the divorce proceedings on September 9, 2009, which was when he first found out about the divorce. Pursuant to the divorce, E. asked for defendant to be allowed only two hours of visitation a week, and only at a movie theater or a bowling alley.

**Prosecution Rebuttal**

Lynn Brand works for the hotel franchise at the Phoenix airport that was formerly the Sheraton. She is in charge of the finances and record-keeping. She produced records showing that on August 16, 2005, the Sheraton Hotel at the Phoenix Airport had 181 rooms that were occupied, out of a total of 210 rooms. Twenty-five of the vacant rooms had two beds in them. If a customer who originally booked a room with one bed later asked for a room with two beds, he would be offered one of those rooms. If someone asked for a rollaway bed, one would be provided if available. Although frequent flier customers stayed on the fourth floor, they were not obliged to do so. In 2005, a room with one bed would have contained a desk chair and a more comfortable chair. Cushions from the desk chair would not come off, and only one cushion, about two feet long, could be taken from the comfortable chair. There was no regulation that teenagers could not sleep in a room by themselves if they were accompanied by an adult.

16

## DISCUSSION

### I. Unanimity Instruction

#### A. Defendant's Argument

Defendant contends that there were approximately 22 distinct acts that could have constituted the lewd act upon a child that was charged in count 2 of the amended information. Although the trial court gave a unanimity instruction with respect to count 5, which also charged the offense of lewd act upon a child, it failed to do so in count 2. The error, which constituted a violation of due process, was not harmless under the circumstances of this case.[4]

#### B. Relevant Authority

A jury verdict must be unanimous in a criminal case. If the accusatory pleading charges a single offense, and the evidence shows the defendant committed more than one act that could constitute that offense, the jury must be instructed that the defendant can be found guilty only if the jurors unanimously agree the defendant committed the same, specific act comprising the crime. This requirement is intended to eliminate the danger that the defendant will be convicted even though there is no single offense that all jurors agree he or she committed. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) A unanimity instruction typically applies to acts that could have been charged as separate offenses. (*People v. Edwards* (1991) 54 Cal.3d 787, 824.)

---

[4]     CALCRIM No. 3501 was read as follows: "The defendant is charged with Lewd Act Upon a Child in count 5, Unlawful Sexual Intercourse in counts 6 and 7, and Sexual Penetration by a Foreign Object in count 8, sometime during the period of August 10, 2005 to March 23, 2008. Please refer to the instruction for each count for the exact time period for each offense. The People have presented evidence of more than one act to prove that the defendant committed these offenses. You must not find the defendant guilty unless, No. 1, you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed for each offense, or, 2, you all agree that the People have proved that the defendant committed all the acts alleged to have occurred during the time period and have proved that the defendant committed at least a number of offenses charged."

17

"In deciding whether to give the [unanimity] instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*People v. Russo*, *supra*, 25 Cal.4th at p. 1135.) "The duty to instruct on unanimity when no election has been made rests upon the court sua sponte. [Citation.] Because jury unanimity is a constitutionally based concept, '. . . the defendant is entitled to a verdict in which all 12 jurors concur, beyond a reasonable doubt, as to each count charged.' [Citation.]" (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534.)

When a unanimity instruction is required, it is settled that failure to give the instruction is "'"harmless when disagreement by the jury is not reasonably probable."'" (*People v. Jenkins* (1994) 29 Cal.App.4th 287, 299.)

### C. No Error

We believe that a unanimity instruction was not required in this case with respect to count 2. The requirement of jury unanimity on a specific act (assuming the evidence indicates the jurors might disagree on the act committed) does not apply "where it has been pointed out to the jury in some way other than an instruction which charge is being relied upon." (*People v. Madden* (1981) 116 Cal.App.3d 212, 217, fn. 4.) The jury can receive such information by the manner in which the evidence is presented and by argument from counsel. (*Ibid.*) If, given the evidence at trial, juror disagreement over the act constituting a charged offense is not reasonably possible, a unanimity instruction is not required. (*People v. Rocha* (1996) 48 Cal.App.4th 1060, 1071.)

In the instant case, there were four counts charged for the time period of August 10 through September 20, 2005—counts 1, 2, 4, and 5. The prosecutor explained to the jury that count 1 was the rape by force committed when Anna was ironing defendant's shirts. Count 4 was the oral copulation with a minor that occurred in the Lake Arrowhead home in San Bernardino County. Count 2 was the lewd act with a minor that occurred while the rest of the family went to Costco, and count 5 was

18

comprised of the lewd acts with a minor that occurred when defendant took Anna in the car to register for school and had sex with her in the car, and when he took her to the movies and had sex with her in the car.[5] Thus, the record shows that the prosecutor, in her closing argument, told the jury that count 2, charging the commission of a lewd act with a child who is 14 or 15 years of age, referred to the Costco incident, and no unanimity instruction was necessary. By contrast, the incidents in count 5 required a unanimity instruction because the acts allegedly occurred on two different occasions, on two different car trips.

Defendant, however, argues that there were several acts within what was labeled the Costco incident. We disagree. Anna testified that defendant asked her to help install a television while the rest of the family went to shop at Costco. As she sat on the couch, defendant put his hand on her thigh and began moving it up. He asked her to go upstairs with him, and they went and had sex in his bed. There was no need for the prosecutor to parse this act into two acts—a hand on the thigh and sexual intercourse— nor would it have been reasonable. The acts that occurred were performed in sequence and formed part of one continuous course of conduct that culminated in defendant's having sexual intercourse with Anna. A unanimity instruction is not required where the acts are so closely related as to form part of a single transaction or a continuous course of conduct. (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100; *People v. Crandell* (1988) 46 Cal.3d 833, 875.) A continuous course of conduct arises in two contexts. (*People v. Thompson* (1984) 160 Cal.App.3d 220, 224.) "The first is when the acts are so closely connected that they form part of one and the same transaction, and thus one offense. [Citation.] The second is when . . . the statute contemplates a continuous course of conduct of a series of acts over a period of time. [Citation.]" (*Ibid.*) The Costco incident clearly fell within the first category.

---

[5]    At least in this trial, Anna did not testify that she and defendant had sex in his car when he took her to register for high school.

19

This case is therefore distinguishable from *People v. Melhado*, *supra*, 60 Cal.App.4th 1529, cited by defendant. In that case, which involved a series of criminal threats, the jury was never informed which event the prosecutor had elected to rely upon, although the prosecutor had communicated his choice to the trial court. (*Id*. at p. 1535.) During argument, the prosecutor referred to multiple acts that might constitute criminal threats. (*Id*. at p. 1535 & fn. 5.) Although the reviewing court could distinguish, by parsing the words of the argument, that the prosecutor placed slightly more emphasis upon the chosen event, the argument had not satisfied the requirement that the jury must be instructed on unanimity or informed of the prosecutor's election. By contrast, the prosecutor in the instant case clearly spelled out for the jury the incident that formed the basis for count 2, and the incident constituted a continuous course of conduct. There was no error, and defendant suffered no due process violation based on the lack of a unanimity instruction in count 2.

## II. Jury Instructions in Counts 2 and 5

### A. Defendant's Argument

Defendant complains that the jury instruction on the elements of a violation of section 288, subdivision (c)(1), the offense charged in counts 2 and 5, omitted any requirement of an intent other than the requirement that the touching be "willful." Defendant argues that the omission of the element requiring the jury to find that defendant acted with the intent of arousing or gratifying the sexual desires of himself or the child is an essential and controlling element of the crime and must be proved beyond a reasonable doubt.

### B. Proceedings Below

The trial court initially read CALCRIM No. 1112, the pertinent jury instruction, without including the intent element. After concluding the reading and conferring with counsel, the trial court told the jury, "I paused when reading a jury instruction because something just didn't seem right. I checked the book and it wasn't right. So when I read you the jury instruction dealing with counts 2 and 5, it was an incomplete statement of

20

the law, so I'm going to reread it to you and modify it so you have it back with you."

The trial court then read the entire instruction correctly.**6**

### C. Relevant Authority

Section 288, subdivision (c)(1), proscribes the "'"touching" of an underage child committed with the intent to sexually arouse either the defendant or the child.'" (*People v. Murphy* (2001) 25 Cal.4th 136, 145-146.) "'In all cases arising under [section 288] the purpose of the perpetrator in touching the child is the controlling factor and each case is to be examined in the light of the intent with which the act was done. In *People v. Owen* [1945] 68 Cal.App.2d 617, 620, it is said that "It is not the accomplishment but the intent of the party that is the basis of the commission of the acts condemned in Penal Code section 288." If intent of the act, although it may have the outward appearance of innocence, is to arouse, or appeal to, or gratify the lust, the passion or the sexual desire of the *perpetrator* it stands condemned by the statute, or, if it is intended to arouse feelings of passion or sexual desire in the *child*, it likewise stands condemned.' [Citation.]" (*People v. Levesque* (1995) 35 Cal.App.4th 530, 541.)

---

**6** CALCRIM No. 1112 was read to the jury as follows: "The defendant is charged in counts 2 and 5 with a lewd or lascivious act on a 14- or 15-year-old child who was at least 10 years younger than the defendant in violation of Penal Code section 288(c)(1). To prove that the defendant is guilty of this crime, the People must prove that the defendant willfully touched any part of a child's body either on bare skin or through the clothing; *No. 2, the defendant committed the act with the intent of arousing, appealing to, or gratifying the lust, passions or sexual desires of himself or the child*; No. 3, the child was 14 or 15 years old at the time of the act; No. 4, when the defendant acted, the child was at least 10 years younger than the defendant. Someone commits an act willfully when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage. Actually arousing, appealing to, or gratifying the lust, passions or sexual desires of the perpetrator or the child is not required. It is not a defense that the child may have consented to the act. In determining whether a person is at least 10 years older than the child, measure from the person's birth date to the child's birth date. Under the law a person becomes one year older as soon as the first minute of his or her birthday had begun." (Italics added.)

21

When oral and written instructions conflict it is presumed the jury followed the written instructions. (*People v. Mills* (2010) 48 Cal.4th 158, 201; *People v. Majors* (1998) 18 Cal.4th 385, 409-410; *People v. Osband* (1996) 13 Cal.4th 622, 717.) "When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner. [Citations.]" (*People v. Wilson* (2008) 44 Cal.4th 758, 803-804.)

"'Under established law, instructional error relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violates the defendant's rights under both the United States and California Constitutions.' [Citation.]" (*People v. Cox* (2000) 23 Cal.4th 665, 676.) "[S]uch misinstruction [is] subject to harmless error analysis under the *Chapman* [*v. California* (1967) 386 U.S. 18, 24] standard of review." (*Ibid*.) "Under that test, an error is harmless only when, beyond a reasonable doubt, it did not contribute to the verdict. [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 635, 689.)

### D. *Any Error Harmless*

We must rely on the clerk's transcript in this case, which indicates that the trial court failed to give the jury a written copy of the corrected version of CALCRIM No. 1112. Assuming this occurred, we conclude the instructional error was harmless beyond a reasonable doubt. Giving the jury a written instruction that omits a portion of the oral instruction read to them by the court is not tantamount to not giving them the instruction at all. The trial court orally gave the correct instruction and, indeed, it called attention to this instruction. Although primacy is given to the written version of an instruction if a conflict exists between it and an oral version, "the jury is not informed of this rule. It is thus possible the jury followed the oral instruction." (*People v. Wilson*, *supra*, 44 Cal.4th at p. 804.) Furthermore, the specific intent required in this case was that of arousing, appealing to, or gratifying the lust of the child or the accused. (*People v. Mullens* (2004) 119 Cal.App.4th 648, 661-662.) No reasonable jury could have found that defendant's

actions of putting his hands on Anna's thigh preparatory to asking her to go upstairs where he engaged in sexual intercourse with her were done for any intent other than the sexual arousal or gratification of himself and Anna. The same holds true for the sex acts in the car. Accordingly, assuming the trial court did not give the jury members the corrected written instruction, we find the error harmless beyond a reasonable doubt.

## III. Alleged Compromise Verdict

### A. Defendant's Argument

Defendant points out that the jury in defendant's trial—his third one—was unable to reach a verdict in four of the counts, and its verdicts in the remaining counts consisted of two acquittals and only two convictions. Defendant contends that if, as the verdicts reflect, all 12 jurors rejected Anna's testimony regarding all of the allegations of sexual misconduct as not worthy of belief beyond a reasonable doubt, there is no substantial evidence that defendant committed the crime of lewd act upon a child two times, as found in counts 2 and 5. In every instance that Anna alleged defendant touched her in a sexual manner, she also alleged more substantial sexual conduct, such as forcible rape and sodomy, but the jury either acquitted defendant of these more substantial acts, or it could not reach a verdict. The only conclusion that can be drawn from these circumstances is that the guilty verdicts in counts 2 and 5 were a compromise and not based upon proof beyond a reasonable doubt. A compromise verdict under the circumstances of this case is fundamentally unfair and a denial of due process. Reversal of those counts is required.

### B. Relevant Authority

A reviewing court "must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) Reversal is only warranted where it clearly appears "'that upon no hypothesis whatever is

23

there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

### C. Defendant's Compromise Verdict Argument Fails

Defendant's claim is, of course, speculative. There is no evidence in the record that the jury reached a compromise verdict, and reversal of his two convictions cannot be based on defendant's supposition of what occurred in the jury room. Moreover, even assuming the verdicts came about as a compromise, this does not invalidate the verdicts. "Inconsistency in a verdict is not a sufficient reason for setting it aside. We have so held with respect to inconsistency between verdicts on separate charges against one defendant, [citation] and also with respect to verdicts that treat codefendants in a joint trial inconsistently, [citation] . . . both of those opinions stressed the unreviewable power of a jury to return a verdict of not guilty for impermissible reasons." (*Harris v. Rivera* (1981) 454 U.S. 339, 345-346.)

We do not wish to engage in the same sort of speculation as defendant, but we do note that the incidents charged in counts 2 and 5 were among the earliest incidents between Anna and defendant after the initial sexual encounter in a Phoenix hotel in August of 2005. The Costco incident occurred shortly after the return from Phoenix, and the school registration and movie outings occurred very soon after, although the record is not clear as to whether the forcible sodomy that occurred while Anna was ironing defendant's shirts took place in between. Anna testified that sex with defendant became routine after the second time and that she even initiated sex with defendant at times in her junior year of high school and was in love with him. Given this testimony, the jury members may have improperly considered Anna's consent to some of the sexual encounters.[7] In any event, we reject defendant's argument, since there is sufficient evidence to support the jury's verdicts.

---

[7] The jury foreman reported that the vote was 11 to 1 on the deadlocked counts.

24

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


                            BOREN, P.J.

We concur:


ASHMANN-GERST, J.


FERNS, J.*

_____

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.